UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DARNELL DEON BALONEY** | **CIVIL ACTION** |
| **VERSUS** | **NO. 11-2730** |
| **ENSCO, INC., ET AL.** | **SECTION "H" (2)** |

### ORDER AND REASONS

There are four Motions for Summary Judgment before the Court: a Motion for Summary Judgment to Dismiss the Third Party Complaint of Ensco Offshore Company filed by Bayou Inspection Services, Inc. ("Bayou") (Doc. 54); a Cross Motion for Summary Judgment filed by Ensco Offshore Company ("Ensco") (Doc. 70); a Motion for Summary Judgment to Dismiss the Third Party Complaint of Stone Offshore Energy, LLC filed by Bayou (Doc. 56); and a Cross Motion for Summary Judgment filed by Stone Offshore Energy, LLC ("Stone") (Doc. 65). For the following reasons, Bayou's Motion for Summary Judgment against Ensco (Doc. 54) is DENIED, Ensco's Cross-Motion

-1-

for Summary Judgment against Bayou (Doc. 70) is GRANTED, Bayou's Motion for Summary Judgment against Stone (Doc. 56) is DENIED, and Stone's Cross-Motion for Summary Judgment (Doc. 65) is GRANTED.

**BACKGROUND**

*I.    Factual Background*

On November 16, 2010 Darnell Baloney ("Baloney"), a Non-Destructive Testing Trainee/Helper, was working aboard the ENSCO 99. In order to perform x-ray and magnetic testing on a crane located on the ENSCO 99, Baloney worked from a suspended metal personnel basket attached to another crane on the ENSCO 99. While suspended, the crane operator allegedly caused Baloney's metal personnel basket to strike the crane's cable thereby causing the basket to tilt and jerk. As a result, Baloney alleges that he sustained injuries.

At the time of the alleged incident, Baloney was an employee of Bayou. Bayou performs non-destructive x-ray and magnetic particle testing on welded surfaces. The services provided by Bayou are performed onsite at client facilities both onshore and offshore.

Bayou was performing work on the ENSCO 99 pursuant to an "Agreement for the Performance of Services and Provision of Goods and Facilities" ("Bayou-Ensco Agreement") entered into between Bayou and Ensco. The Bayou-Ensco Agreement provides that Bayou may provide goods or services to support Ensco's operations of offshore drilling rigs and offshore supply/AHTS

vessels. The Bayou-Ensco Agreement states that any Bayou-Ensco transaction shall be covered by a specific "Work Order" or "Purchase Order."

Under the Bayou-Ensco Agreement, Ensco placed a verbal work. Ensco requested that Bayou inspect the welds of a drilling pipeline and crane boom located on the ENSCO 99. The verbal work order requested the use of x-ray photography and magnetic particle testing. In order to complete the verbal work order, Bayou assigned Baloney and Paul Brummet ("Brummet") to the ENSCO 99.

The ENSCO 99 is a vessel owned and operated by Ensco pursuant to a contract with Stone. More specifically, the ENSCO 99 is a "mobile offshore drilling unit" ("MODU") that is commonly referred to as a "jack-up rig." On November 16, 2010, the ENSCO 99 was jacked up and temporarily affixed to the Outer Continental Shelf at "Ship Shoal Block 93."

II.   *Procedural Background*

Baloney filed suit against Ensco and Stone on November 2, 2011 alleging negligence under general maritime law. (Doc. 1.) Stone filed a Third Party Complaint against Bayou on February 14, 2012 asserting that, pursuant to a Stone-Bayou General Work Agreement, Bayou agreed to protect, defend, and indemnify Stone from the claims underlying the instant matter. (Doc. 10.) Stone later amended its Third Party Demand. (Doc. 25.) On May 29, 2012 Ensco filed a Third Party Complaint against Bayou contending that Bayou is required to protect, defend, and indemnify Ensco from and against any and all claims for injuries of Bayou employees. (Doc. 30.)

On October 24, 2012 Stone filed a Motion for Summary Judgment requesting dismissal of Plaintiff's claims. (Doc. 47.) On November 29, 2012 the Court granted Stone's Motion for Summary Judgment. (Doc. 52.) Stone remained in the instant matter only as a Third Party Complainant against Bayou.

On December 7, 2012 Bayou filed a Motion for Summary Judgment to Dismiss Ensco's Third Party Complaint (Doc. 54) and Stone's Third Party Complaint (Doc. 56). Stone filed a Cross Motion for Summary Judgment on December 21, 2012. (Doc. 65.) Ensco filed a Cross Motion for Summary Judgment on December 31, 2012. (Doc. 70.) On January 30, 2013 the Court heard oral argument on these Motions. (Doc. 82.) The Court took the Motions under submission at that time, and now enters its ruling.

**LEGAL STANDARD**

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of fact exists only "[i]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether the movant is entitled to summary judgment, the Court views facts

in the light most favorable to the nonmovant and draws all reasonable inferences in his favor. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528 (5th Cir.1997). "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir.1995). Summary judgment is appropriate if the non-movant "[f]ails to make a showing sufficient to establish the existence of an element essential to that party's case...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "In response to a properly supported motion for summary judgment, the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial. *John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir.2004) (internal citations omitted). "We do not ... in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Badon v. RJR Nabisco, Inc.*, 224 F.3d 382, 394 (5th Cir.2000) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994)). Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion." *Boudreaux v. Banctec, Inc.*, 366 F.Supp.2d 425, 430 (E.D. La. 2005).

**LAW AND DISCUSSION**

Before the Court are four Motions for Summary Judgment. The Motions request the Court to determine, as a matter of law, whether the Bayou-Ensco Agreement is a maritime or non-maritime contract.

For the reasons that follow, the Court finds that the Bayou-Ensco Agreement is a maritime contract. Accordingly, maritime law applies to the Bayou-Ensco Agreement and ousts any application of the Outer Continental Shelf Lands Act, which adopts state law. Because general maritime law applies, the indemnity provisions in the Bayou-Ensco Agreement are valid and enforceable. Based on these findings, Bayou's two Motions for Summary Judgment are denied, Ensco's Motion for Summary Judgment is granted, and Stone's Motion for Summary Judgment is granted.

I.      *Arguments of the Parties*

Bayou maintains that the Bayou-Ensco Agreement is a non-maritime contract. Because the Bayou-Ensco Agreement is a non-maritime contract, Bayou contends that the Outer Continental Shelf Lands Act ("OCSLA") applies and Louisiana law will act as surrogate state law. When Louisiana law applies, Bayou alleges that the Louisiana Oilfield Anti-Indemnity Act ("LOAIA") will apply thereby rendering the indemnity provisions in the Bayou-Ensco Agreement unenforceable. Accordingly, Bayou requests the Court to dismiss the claims of both Stone and Ensco.

Stone and Ensco argue that the Bayou-Ensco Agreement is a maritime contract, because

it pertains to the services of a vessel, namely the ENSCO 99. Stone and Ensco conclude that, under maritime law, indemnity provisions, such as the ones found in the Bayou-Ensco Agreement, are routinely upheld and enforceable. As such, Stone and Ensco request the Court to grant their summary judgment.

*II.     Whether the Bayou-Ensco Agreement is a Maritime Contract*

The first issue that the Court must decide is whether the Bayou-Ensco Agreement is a maritime contract. *See Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,* 589 F.3d 778, 789 n.9 (5th Cir. 2009) ("in determining whether state law applies in an OCSLA action, predicated on a contract, it is permissible to consider whether the contract at issue is a maritime contract before considering whether OCSLA situs has been established"). For the reasons that follow the Court finds that the Bayou-Ensco Agreement is a maritime contract. Accordingly, the Court pretermits any discussion as to the applicability of OCSLA in this matter.

In determining whether a contract is maritime, the Court's consideration is two-fold. *Davis and Sons, Inc. v. Gulf Oil Corporation*, 919 F.2d 313 (5th Cir. 1990), *reh'g denied*, 924 F.2d 1054 (1991). Specifically, a court must analyze the historical treatment of similar contracts in the jurisprudence and also make a fact-specific inquiry. *Davis*, 919 F.2d at 316. If the historical treatment is dispositive then a court is directed to make a fact-specific inquiry. When making this inquiry, courts must analyze these six factors: (1) what does the specific work order in effect at the time of the injury provide; (2) what work did the crew assigned under the work order actually do;

(3) was the crew assigned to work aboard a vessel in navigable waters; (4) to what extent did the work being done relate to the mission of the vessel; (5) what was the principal work of the injured worker; and (6) what work was the injured worker actually doing at the time of the injury. *Id.* "The maritime or non-maritime status of the contract ultimately depends on its 'nature and character,' not on its place of execution or performance." *Hoda v. Rowan Companies, Inc.*, 419 F.3d 379, 381 (5th Cir. 2005) (quoting *Davis*, 919 F.2d at 316).

    A.    <u>Historical Treatment of Similar Contracts</u>

The Fifth Circuit has recognized that there are "[i]nherent tensions between the non-maritime nature and concerns of traditional oil and gas drilling and those of the salty locale in which such exploration often occurs." *Hoda*, 419 F.3d at 382. When services are peculiar to the oil and gas industry, and not maritime commerce, then these do not constitute maritime contracts. *See id.* On the other hand, when the obligation underlying the contract is inextricably intertwined with the activities of the vessel and could not be performed without the vessel's direct involvement, then there is a strong basis for finding a maritime contract. *Id.*

Specific to the instant matter, the fact that a jack-up drilling rig is a vessel is not dispositive of the nature or character of the contract. *Domingue v. Ocean Drilling & Exploration Co.*, 923 F.2d 393, 397 (5th Cir. 1991). In turn, the courts' interpretations of contracts involving work on jack-up rigs has been fluent. In some instances, courts have found that, although the obligation under the contract was inherently non-maritime in nature, the contract was maritime because the use of the

rig-vessel was central to the work performed under the contract.[1] Other courts, however, have found that a non-maritime obligation forms a non-maritime contract, regardless of the fact that the work was performed on a rig-vessel.[2]

Thus, neither the fact that a contract calls for services to be performed on a jack-up drilling rig, a vessel, nor the fact that such services are traditionally non-maritime is determinative. *See Energy XXI, GoM, LLC v. New Tech Engineering, L.P.*, 787 F. Supp. 2d 590, 601–02 (S.D. Tex. 2011). An analysis of the historical treatment may sometimes be clear enough to make a determination of the contract without necessitating the Court to assess the contract further. *Hoda*, 419 F.3d at

---

[1] *See, e.g.*, *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 115, 1123 (5th Cir. 1992) (a contract using a jack-up rig to accomplish drilling oil and gas wells is maritime); *Hoda*, 419 F.3d at 382 (torquing up and down blowout preventer stacks on a jack-up rig is maritime in nature); *Devon La. Corp. v. Petra Consultants*, Inc. 247 F. App'x 539, 545 (5th Cir. 2007) (while the torquing of bolts on blowout preventer stacks does not require the use of the vessel or its crew, the work would have been irrelevant and impossible if the vessel's rig was not used and therefore the contract is maritime); *Lopez v. Magnolia Industrial Fabricators*, No. 05-0371, 2006 WL 2850447, at *4 (E.D. La. Oct. 3, 2006) (the contract for crane inspection services on a jack-up drilling rig is maritime); *Demette v. Falcon Drilling Co., Inc.*, 280 F.2d 492 (5th Cir. 2002) (when the work being performed is integral to the primary purpose of the vessel then the contract is maritime); *Diamond Offshore Co. v. A&B Builders, Inc.*, 75 F. Supp. 2d 676, 680 (5th Cir. 1999) (welding a pollution pan onto a semi-submersible drilling rig, a vessel, so that it would be fit to perform its function of offshore oil exploration is considered a vessel repair which is maritime in nature).

[2] *Domingue v. Ocean Drilling and Exploration Co.*, 923 F.2d 393 (5th Cir. 1991) (when a vessel only serves as a work platform to perform services that are peculiar to the oil and gas industry then the contract is non-maritime); *Thurmond v. Delta Well Surveyors*, 836 F.2d 952 (5th Cir. 1988) (the use of a work barge was only incidental to the performance of the contract and therefore the contract was maritime)

381 (citing *Demette*, 280 F.3d at 500). This is not the case here. While the Court acknowledges the significant precedent weighing in favor of finding the Bayou-Ensco Agreement is a maritime contract, the Court feels that further analysis is needed. Accordingly, the Court analyzes the *Davis* factors.

      B.      The *Davis* Factors

In *Davis*, the Court interpreted a Master Service Agreement ("MSA") whereby the contractor would provide labor and general contracting services. *Davis*, 919 F.2d at 314. The MSA did not further specify any work to be performed. *Id.* The work to be performed was provided in later, periodic work orders calling for the performance of specific services. *Id.* This Court finds that the situation in this case is substantially similar to that presented to the *Davis* Court. Thus, where the contract consists of both a MSA (in this case the Bayou-Ensco Agreement) and subsequent work order(s), the two must be interpreted together in evaluating whether the contract is a maritime contract. *Davis*, 919 F.2d at 315.

The first *Davis* factor requires the Court to consider the specific work order in effect at the time of the injury. In this case, a verbal work order contracted Bayou to perform x-ray and magnetic particle testing on a drilling pipe and crane aboard the ENSCO 99. (Doc. 64-4.) The court in *Lopez* found that a contract calling for the maintenance and inspection of a crane located on a jack-up rig is "[p]roperly categorized as work on an appurtenance of a vessel." *Lopez*, 2006 WL 2850447, at *4; *see also Diamond Offshore Co.*, 302 F.3d at 550 (a work order for welding and

-10-

supplying labor and materials to repair a semi-submersible drilling rig is maritime).  Similarly, the work order here deals with a necessary part of the jack-up rig.  Accordingly, this factor weighs in favor of the Bayou-Ensco Agreement being a maritime contract.

The second factor requires the Court to analyze what work the crew assigned under the work order actually did.  Bayou assigned Brummet and Baloney to perform inspection and repair services to the cranes and drilling pipes of the ENSCO 99.  At the time of Baloney's accident, Baloney was performing x-ray work and magnetic testing on a crane located on the ENSCO 99. (Doc. 54-2 at 33-34.)  Courts are consistent in holding that repair services to a vessel are maritime in nature.  *See Diamond Offshore Co.*, 302 F.3d at 549 ("contracts for vessel repair services are traditionally treated as maritime").  Accordingly, the Court finds that this factor militates a in favor of a maritime contract.

The third factor asks the Court to consider whether the crew was assigned to work aboard a vessel in navigable waters.  It is without a doubt that a jack-up rig is considered a vessel.  *See Demette*, 280 F.3d at 498, n. 18 ("[t]his circuit has repeatedly held that special-purpose movable drilling rigs, including jack-up rigs, are vessels within the meaning of admiralty law").  Accordingly, this factor favors a finding that the Bayou-Ensco Agreement is a maritime contract.

Under the fourth factor, the Court must question the extent to which the work being done was related to the mission of the vessel.  Bayou contends that because the work Baloney was performing did not relate to the navigation function of the vessel.  Stone and Ensco, however,

-11-

assert that inspection of the crane is specifically related to the mission of the vessel. Specifically, they argue that the vessel cannot perform its intended function of drilling if the crane is malfunctioning.

Bayou cites to no authority, nor can this Court find any, that requires the work to be related to the navigation of the vessel. On the other hand, several courts have found that a crane is an integral instrument for drilling, which is the primary purpose of a jack-up rig. Moreover, the ENSCO 99 is not a mere work platform, but a vessel that has been jacked-up for the purpose of exploration and drilling. The crane work on the ENSCO 99 is essential to its functionality and accordingly, its mission. In turn, the Court finds that this factor weighs in favor of the Bayou-Ensco Agreement being characterized as a maritime contract.

The fifth and sixth factors related to the tasks of the injured worker. Specifically, the Court must assess the principal work of the injured worker and what the injured worker was doing at the time of the alleged injury. Baloney's primary task was to perform x-ray and magnetic testing services on the cranes and drill pipes of the ENSCO 99. He was working from a personnel basket performing these inspection services on one of the ENSCO 99 cranes at the time of the accident. As such, his principal work related directly to the mission of the vessel, and he was performing this work at the time of the incident. Accordingly, these two factors weigh in favor of the Bayou-Ensco Agreement being a maritime contract.

Ultimately, there is no broad characterization whereby oil and gas services contracts are

maritime whenever they contribute to the mission of a jack-up drilling rig. *See Hoda*, 419 F.3d at 383. Accordingly, courts are directed to make a fact-specific inquiry. Based on the facts of this case the Court finds that the Bayou-Ensco Agreement is indeed a maritime contract.

III.     *Indemnity Provisions*

Because the Bayou-Ensco Agreement is a maritime contract, the contract's indemnity provisions are enforceable under maritime law. *See Hoda*, 419 F.3d at 383. Accordingly, both Ensco and Stone are entitled to indemnity in the instant matter.

The indemnity claims made by Stone and Ensco arise under from the Bayou-Ensco Agreement. The Bayou-Ensco Agreement provides the following indemnity provision:

> Contractor [Bayou] agrees to be responsible for, protect, defend, release, indemnify and hold Company [Ensco], its parent, subsidiaries, associated or affiliated companies, and their respective shareholders, directors, officers, employees, insurers, servants and agents, free and harmless from and against any and all losses, costs, claims, causes of action and liabilities (including, without limitation, the costs of suit and reasonable attorney's fees) arising in favor of any party on account of injury to, or death of, or damage to or loss of property of Contractor [Bayou], its parent, subsidiaries, associated or affiliated companies, its contractors or sub-contractors of Contractor, and each of their respective shareholders, directors, officers, employees, insurers, servants, agents, invitees or gusts, or the survivors of any of them, resulting from or relating in any way to this Agreement for the Performance of Services, or activities or omissions in connection herewith, regardless of whether Company [Ensco], or others under contract to Company [Ensco], may have been solely or concurrently negligent (passive or active), to any degree, or otherwise at fault, and regardless of the unseaworthiness of any vessel, any defect in premises, goods, equipment or materials, and irrespective of whether the same pre-existed this Agreement for the Performance of Services.

(Doc. 64-2 at 2-3.) The Bayou-Ensco Agreement extends these indemnity provisions for Operators

of Ensco. Specifically:

> it is recognized by Contractor [Bayou] that Company [Ensco], and its affiliated companies, own and/or operate numerous land and offshore drilling rigs and offshore supply vessels and that the goods/services to be furnished by Contractor [Bayou] may not always be related to a specific location or facility and that Contractor [Bayou] may be requested to furnish goods/services at any of said locations or facilities. It is further recognized and acknowledged by Contractor [Bayou] that Company [Ensco], as a drilling and marine vessel contractor, performs its services under contract with various energy related companies, sometimes referred to as "Operators." In the performance of its obligations under this Agreement for the Performance of Services, Contractor [Bayou] is required, and by its execution of this Agreement so covenants, to extend the benefit of his indemnification and insurance, including additional insured status and waivers of subrogation, to any Operator for whom Company [Ensco] may be performing services under written Contract, for any period during which Contractor [Baloney] furnishes goods/services pursuant to this Agreement for the Performance of Services.

(Doc. 64-2 at 5-6.)

At the time of Baloney's alleged incident, an agreement titled "IADC Domestic Daywork Drilling Contract - Offshore" ("Ensco-Stone Agreement") was in effect between Stone and Ensco. (Doc. 64-1.) The Ensco-Stone Agreement details that

> Operator [Stone] desires to have offshore wells drilled or worked over in the Operating Area and to have work performed or carried out all auxiliary operations and services as detailed in the Appendices . . . and Contractor [Ensco] is willing to furnish the drilling vessel [ENSCO 99] designated in Appendix A together with drilling and other equipment (hereinafter called the "Drilling Unit"), insurance and personnel, all as detailed in the Appendices hereto, for the purpose of drilling said wells and performing said auxiliary operations and services for Operator [Stone].

(Doc. 64-1 at 3.)

-14-

"A maritime contract containing an indemnity agreement, whether governed by federal maritime or Louisiana law, should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 834 (5th Cir. 1992). The indemnity provisions "[s]hould not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981). Thus, an indemnity provision "will not afford protection unless its terms are expressed unequivocally." *Hardy*, 949 F.2d at 834.

The Court finds that the indemnity provisions found in the Bayou-Ensco Agreement are clear and unambiguous. It is clear that Bayou has agreed to be responsible for, protect, defend, release, indemnify and hold Ensco harmless against any and all losses, costs, claims, causes of action and liabilities (including, without limitation, the costs of suit and reasonable attorney's fees) arising out of an injury to a Bayou employee. (Doc. 64-2 at 2-3.) Moreover, Stone is rightfully considered an Operator under the clear terms of the Bayou-Ensco Agreement. (Doc. 64-2 at 5-6; see also Doc. 64-1 at 3.) It is clear that Bayou agreed to extend the benefits of its indemnification and insurance to any Operator, including Stone. (Doc. 64-2 at 5-6.)

The Court finds that the Bayou-Ensco Agreement and the indemnity provisions are clear and unequivocal. Accordingly, both Stone and Ensco are entitled to the enumerated indemnity protections.

## CONCLUSION

For the foregoing reasons, Bayou's Motion for Summary Judgment against Ensco is DENIED, Ensco's Cross-Motion for Summary Judgment against Bayou is GRANTED, Bayou's Motion for Summary Judgment against Stone is DENIED, and Stone's Cross-Motion for Summary Judgment is GRANTED.

New Orleans, Louisiana on this 1st day of May, 2013.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT COURT JUDGE**